Roberts, your argument next in Case 16-1454, Ohio et al. v. American Express Company. Murphy. Murphy, Mr. Chief Justice, and may it please the Court. The government met its initial burden to show anti-competitive harm in this case under the rule of reason by proving that American Express's anti-steering provisions have stifled inter-brand price competition and raised the prices that all four credit card companies charge merchants. The restraints have these horizontal effects because they bar merchants from accurately informing their retail customers about the different costs of credit cards and from offering them incentives, such as price discounts, to use cheaper cards. As a result, retail customers make decisions about which card to use in the dark about their relative costs, and merchants cannot reward credit card companies with greater market share by lowering their prices. As a result, that eliminates any incentive for credit card companies to do so. As Discover's president testified about its failed price-cutting strategy in the late 1990s, price cuts simply gave away money in the form of a lower price. We're not here to protect competitors, right, Mr. Murphy? Correct. Or necessarily even merchants. The antitrust laws are aimed at protecting consumers. You'd agree with that? Correct, although in this case... Okay, so given that, there's no evidence of restricted output in this case, correct? I would agree that it's ambiguous. There's no one way or the other about whether it has restricted output. And that's normally what the antitrust laws care about, is deadweight loss. That's the primary concern of antitrust activity. Wouldn't you agree? Correct, although I think the... Okay, all right. So you're left with this price question, and you have an increase in price to merchants, but do we have any evidence that consumers, at the end of the day, including the rewards aspect of what they get back, actually pay a net price increase? Absolutely, we have evidence of restricted competition. What evidence do you have of that? No, no, no, evidence of price, net price increase to consumers. Well, so we don't think that we legally have to meet that. I know you don't. I'm just asking, do you have any evidence of it? Factually, the district court held at district court petition appendix pages 166 to 167 that the higher net prices were not offset by higher cardholders. Well, you have proof that not all of the increased price that American Express extracts gets to the consumer. That's not my question, however. My question is, do you have any evidence that on a net basis, consumers pay more? And I don't believe you have. Well, if we're just talking — first off, I think merchants are consumers in this context. I'm asking about consumers. So the cardholder consumers, I think that there is evidence that they have restricted options on that side. Isn't that true, given American Express's tying or restriction, that no merchant can offer a consumer a 5 or 10 or other discount for using Visa, MasterCard or Discover, correct? Absolutely correct. It has restricted competition on that side of the market in the sense of they have less options. An Amex cardholder who would prefer to have a 1 percent discount if the Amex cardholder uses a Discover card, merchants aren't allowed to offer that option. So all consumers, including cardholder consumers, have less options than they would if these anti-steering rules were not in place. They have — essentially, Amex has channeled — Isn't that true with every vertical restraint? Anytime I say I'm only going to service Cadillacs at a Cadillac dealership, I can't buy a Volvo at a Cadillac dealership. All vertical restraints have the impact of restricting inter-brand competition in that respect. But we learned through painful experience and many, many years that they're generally pro-competitive, right? So it's not all inter-brand restraints. So the classic manufacturer-distributor restrictions only affect inter-brand competition in order to promote inter-brand competition. Your hypothetical was about exclusive dealing, which I would admit affects inter-brand competition. That's why the Court has suggested, generally speaking, they are problematic if they tie up too many buyers or sellers. We have a wonderful amicus brief that explains that when you have exclusive dealing, the competition doesn't become a competition for selling that product, but for selling all the competing products, correct? Correct. So that if this car dealership raises its prices too high, other car manufacturers are going to be able to give you a lower-priced car, perhaps of equal quality, correct? Absolutely correct. That's why this is so fundamentally different from the manufacturer-distributor restraints that the Court addressed in Legion. Those restraints, the Court made quite clear that resale price maintenance, for example, inter-brand competition acted as a critical check to make sure that the additional services being provided by resale price maintenance were worth their costs. That's the problem with this restraint. Most vertical restraints only affect inter-brand. So you just have us ignore the fact that Visa and MasterCard have 74 percent of the market? No, I think I do. They exercise no restraint in this marketplace. I do think that this marketplace is entirely, highly concentrated, where all the main competitors were using these types of restraints. As the Court said in Legion, if resale price maintenance is a critical check to make sure that the additional services being provided by resale price maintenance were worth their costs. That's gone, though, right? I mean, any notion of horizontal agreement in this case is out of the case. So I agree that there's no allegations of horizontal agreement, but there's clear evidence of horizontal effect. And when a vertical restraint has a horizontal effect, that is when the vertical restraint becomes problematic. And here it's just conclusive that the purpose and effect of this provision is to cut off price discounts from American Express's competitors and to raise the prices that all four credit card companies charge, which I think makes it problematic because it's market-wide. Could you comment on the brief of the Antitrust Law and Economic Scholars in favor of Respondents? They said for us to focus on output. I know you disagree with their conclusion. Do you agree with their starting analysis that we should think of this in terms of output, which is a multisided platform? I generally think that output is very significant. But in this case, I think the higher prices go hand in hand with the restricted output. The Court has said in the California dental case that higher prices, reduced output, divided markets, all have the same anti-competitive effect. And I want to make something clear. It's not that we don't Although their conclusion was that the output, that this is a market that's frankly phenomenal in terms of its size. That's what I want to make clear, that we have clear evidence of direct causation that the restraints cause higher merchant prices. With respect to the restraints' effect on output, there is just no evidence one way or the other. Output has been expanding, but that doesn't control for factors in this huge economy such as GDP growth, inflation, or any other thing that's going to drive transactions. Does output include premiums or rewards to customers? Yeah. Output would include quality considerations as well. But so we're talking about just the government's initial case here. And as this Court said, higher prices restrict output in any market with downward sloping demand curves. That's why all the circuit courts say that the government can prove its initial burden under the rule of reason by showing either higher prices or restricted output. They're flip sides of the same coin in that respect. And I still think that this Court's vertical restraint case I think Justice Kennedy's question was, given the uniqueness of this market, where you don't have proof of greater output, does that make the price increase irrelevant? I think that that was the nature of his question. He can correct me if I'm wrong. I don't think it does whatsoever, because I think this Court's cases, Catalano, National Professional Society of Engineers, all suggest that a competitor cannot impose a price restraint or restraint on one product attribute in order to channel it to other product attributes. Here would be merchant fees and cardholder rewards. The Court's cases clearly suggest that competition itself should determine the appropriate ratio between quality and price considerations, and in the Court's prior cases, Indiana Dentist, or in this case, merchant fees and cardholder rewards. It's competition. Ginsburg's comment on the Second Circuit's view that what's involved is a credit card transaction, and that includes both services to merchants and services to cardholders, and you can't just deal with one and ignore the other. So I still think that even if under the --" taking the Second Circuit's premise as a given, which is this is just one market, we disagree, we think that the market analysis should be divided separately. But even taking their argument as a premise, their argument is that they can restrict competition with respect to one product attribute in order to channel it to other product attributes. And I think that's fundamentally inconsistent with this Court's cases under Section 1, which say that competition should provide what is the appropriate ratio between these things. I'll give you an example. In the Indiana Dental case, dentists refused to provide x-rays to insurers, and the dentist's argument was that this restriction on the provision of x-rays would improve quality of patient care. The Court rejected that argument. It said you cannot restrict competition with respect to that category, because competition should provide what is the appropriate balance between these competing things. That's our central point. Even if this is one market, competition should decide what is the appropriate ratio between merchant fees and cardholder rewards. Amex is perfectly – we have no problem with Amex's approach of having a high-reward, high-cost card. The problem is that they're trying to insulate that product because they think under the full spectrum of competition, it could not survive from competing arguments such as low-cost, low-reward cards. And so that's simply inconsistent with the basic policies of the Sherman Act, which is that not just price, but quality considerations and all other considerations are best satisfied through competition. And I still think that it's fundamentally inconsistent with this Court's rule of reason cases in the vertical context. In the resale price maintenance context, the Court made quite clear that even though resale price maintenance might lead to higher prices for the higher services being imposed, if consumers didn't like those higher services, they could always switch to cheaper goods, a cheaper manufacturer's good. That is the fundamental problem that we have with this restraint. Unlike resale price maintenance, it has restricted inter-brand competition, and so it's affected all competitors, relieving them of the ability to provide the low-cost product that consumers might want. So if there are no further questions, I'd like to reserve the remainder of my time. Roberts. Roberts. Mr. Stewart. Mr. Chief Justice, and may it please the Court, the purpose and effect of Amex's anti-steering rules is to eliminate price competition across an entire market, yet the Second Circuit held that the plaintiffs had not even established a prime aphasia case of anti-competitive effect. In our view, the Court of Appeals made two fundamental errors. The first was that for purposes of the plaintiff's prime aphasia case, the Court collapsed into, one, what should have been regarded as distinct markets, and at the first stage of the analysis, the Court should have focused entirely on the effects on the market for provision of network services to merchants. The second, and I think perhaps the more fundamental error, and it goes to some of the questions that the Court has been asking, is that even when looking at the cardholder side of the market, the Second Circuit erred by conflating the question, have reward — have cardholder rewards become more generous with the appropriate question, has competition on the cardholder side been enhanced? And I'd like to echo one of the things that Mr. Murphy was saying, that from our point of view, it's entirely legitimate for Amex to pursue a strategy where it produces higher rewards for cardholders and charges a premium, and it's fully free to attempt to persuade its cardholders that the extra value is worth the extra cost. And in all sorts of markets — Mr. Stewart, what would you say, though — I mean, you argue to us that this is a very unique situation and new to any trust law, the two-sided market issue, and assuming all that's true — I'm not sure it is, but taking it as true — why shouldn't we take Judge Easterbrook's admonition seriously, that judicial errors are a lot harder to correct than an occasional monopoly, where you can hope and assume that the market will eventually correct it? Judicial errors are very difficult to correct, and we've had a long and painful experience with vertical restraints in this court. Going back to Dr. Miles, that it took decades to correct in Ligon, Albrecht, which took decades to correct in State Oil. Why should we disregard those admonitions in this case? I assume you'd like us to. Well, we certainly — I mean, we filed a brief in opposition, arguing that the Court shouldn't grant cert because these issues were fairly new. They had — For just these reasons. But I think, given that the Court has taken the case, we certainly would take the point that the Court should not speak more broadly than is necessary. It shouldn't attempt to articulate a sort of unified field theorem that would cover all two-sided markets. It should approach the case cautiously. We do think that there are a couple of principles that the Court can articulate that would be very deeply rooted in precedent and in established ways of looking at the antitrust world. The first is that, for purposes of market definition, for the first step of the analysis, has the defendant impeded competition in the relevant market? The market has always been defined by reference to substitutability. What alternative sources of goods or services out there — Mr. Stewart, you admit, as does General Murphy, that at the second stage, it's appropriate for the Court to take into account how this all plays out on the cardholder's side of the market. That's correct. If that's the case, why doesn't that enter into the question of how you define the market in the first instance? Well, I think it would be hard to determine, for instance, or really conceptually impossible to determine whether Amex had market power in a hypothetical market consisting of both the merchant side and the cardholder side. On the merchant side, Amex competes with three other networks. On the cardholder side, at least with respect to the issuance of cards, it competes with thousands of issuing banks. And the point of using substitutability as a criterion for defining the market and ascertaining market power is to answer the question, if somebody who is dealing with the defendant was dissatisfied with the bargain that was being offered, would it have appropriate alternative sources of supply that it would go to? Does that mean — I don't want to interrupt this line of questioning, but does that mean that at step one, the value to the cardholders shouldn't be part of the analysis? I think you would still say, has — yes, competition has been — But that's a very dangerous step for this Court to take, to analyze the market that way, this two-sided market, to say that we're going to, at step one, look at just one side. That's where I need help. Well, I think it's kind of inherent in the — in the three-step approach that the Court has taken to resolving rule-of-reason cases, where first the plaintiff attempts to establish an anti-competitive effect, then the defendant attempts to establish a pro-competitive justification, and then the third step is the plaintiff can show either that the justification could have been achieved in a different way or that it wasn't really necessary. It's inherent in that formula that practices that can ultimately be justified at the second step may still have anti-competitive effects, and those can be isolated and analyzed separately from the pro-competitive effects. It's a two-sided market. I mean, I've never seen such jargon. In my own mind, I can think of joint costs, oil and gas in a well. I can think of complementary products, nuts and bolts. Can't have a nut without a bolt. And I can think of combining the two, nuts and bolts made out of a special thing called titanium uranium. Okay? Now, there we are. And I can think of different uses for the notion that you have two different products. Some people might say that shows that this agreement had no effect. Ah, if that's a use, I wonder why they entered into it. Okay? Then, second, I can imagine them saying the reason that we have this agreement is because it creates a new, wonderful titanium uranium bolt that never would have been produced otherwise. That's like the manufacturers getting together and saying we have price fixing in order to stop poison toys. Okay. It's never been used as an antitrust justification, but I guess it could be. And then maybe there's three and four and five. It's just that I can't find any of them relevant here, at least not yet. Well, this market is, and we take the point that's made on by some of the briefs on the other side. This market is distinct in the sense that at the time that a transaction is accomplished at a merchant location, services are simultaneously being provided both to the merchant and to the cardholder. And that we do the same thing, don't we, with nuts and bolts? We give the people nuts and we give them bolts. And maybe, I mean, you know, there are loads of, there are a lot of products like that. I guess what I would say from this standpoint is Mr. Murphy, the Federal government, and the Respondents all agree that benefits to cardholders should be considered as part of the antitrust analysis. Breyer. Should really? Because you, and you agree with that? In, for example, we have an agreement among toy manufacturers that we won't sell poison toys. That's always been an absolute mystery to put to the class from Philarita on, because they want to stop the poison toys, but you say, hey, that isn't the job of the antitrust law, that's the job of the Consumer Protection Agency. And so we have a debate. And I didn't know that that issue had been solved in this Court. No, I take your point that perhaps I was imprecise when I said benefits to cardholders, because the Court has made clear in different Sherman Act contexts that in kind of balancing pro-competitive and anti-competitive justifications, you're not just looking at anything that could be characterized as beneficial or harmful. You're looking at harms to or benefits to competition. And our point about the cardholder side is that the Second Circuit may have been right when it said the effect of this, the anti-steering rules, was that on the whole, cardholder benefits may have become more generous, but the court thought that. Sotomayor, just to ask you to finish your second response to Justice Gorsuch, you said the market issue was number one that was fundamental. What's the second principle that you think is important? And number three, borrowing from Justice or going to Justice Breyer's point, I can – I understand the argument why in this case on step one, the two markets should not be joined, but I – it's possible that in some other two-sided market that it might be a step one. Do we have to rule and say that in no market is it? Stewart. No. To take that part of the question first, I think the Court should proceed cautiously about announcing categorical rules and can say that for purposes of this case, it is sufficient to – the fact that there is four-way competition on the merchant side and thousands-way competition on the cardholder side is by itself a sufficient ground for treating these as distinct markets. But to take the other part of your question and Justice Gorsuch's question, the reason that we think that the Court of Appeals analyzed benefits to cardholders incorrectly was that it doesn't focus on benefits to competition. That is, if you imagine MasterCard executives strategizing, how can we get more people to use their MasterCards more often? One thing that they might say is, let's beef up our rewards program, but the other thing that they might say is, let's cut our merchant fees, because if the merchants come in a world where there was no steering, they could say, let's cut our merchant fees, because if the merchant comes to regard our card as its preferred card – And they're free to do that, right? I mean, American Express's agreements don't affect MasterCard or Visa's opportunity to cut their fees, their own fees, or to advertise that American Express's are higher. There is room for all of that kind of competition here. It's just the difference between Cadillacs and Kias. People can choose. Do they want a high-cost, high-reward, low-cost, cheaper alternative? And the two sides can compete with one another. That's exactly right, except that as long as the – and that is the type of environment that we believe the antitrust laws are intended to encourage. And then – Absent a horizontal agreement, we have that, don't we? Usually we would, and this is a rare vertical agreement in the sense that it was a vertical agreement that ultimately had effects that would more commonly be associated with horizontal agreements. Well, that was part of the case originally, but that's gone now, right? Because those agreements have been dropped by Visa and MasterCard. I completely understand and accept that if that were part of the case, we'd have a very different case. No, even without the Visa and MasterCard having their own anti-steering provisions, so long as American Express imposes the anti-steering rules on the merchants that are part of its network, and so long as – I understand the merchants can't, but the competitors can advertise all of these issues, and they can point out their lower merchant fees to consumers, as they do. Visa and MasterCard could advertise in that respect. Now, the advertisements that they might be run would probably be taken with more of a grain of salt than if the merchant was telling her own customer, Visa actually does charge me less than American Express. But even leaving that aside, Visa and – I mean, I'm sorry – Visa and MasterCard can advertise that people in a spirit of public – in a public-spirited way should use their cards, not because they'll gain any tangible advantage, but because the cost to merchants in the aggregates will be low. So, Mr. Malcolm, Stuart – I'm sorry, I apologize. I just want to make sure I understand the argument, then. Is it that the consumer welfare here is measured by the relative effectiveness of advertising by merchants as compared to by Visa and MasterCard? No, it's – I mean, it's the – in your Mercedes and Kia example, it is the difference between Kia saying – running advertisements and saying, buy our cars because they have been produced in a more responsible way and you should contribute to the public good by encouraging these practices, even though you will pay no less for a Kia than for a Mercedes. It's one way of advertising. It's one way of trying to compete. But it's obviously a lot more effective if Kia can say, yes, our cars are not as good, but you pay a lot less for them. And similarly, MasterCard and Visa would like to be able – would like consumers to feel that maybe their – if they wanted to compete on the basis of price, they would want consumers to feel, yes, maybe the rewards will not be extensive, but you will get a discount at the cash register or you will get some other tangible benefit from using our card. And Discover, for instance, when it was trying to implement its low-cost strategy, didn't just propose to lower its merchant fees in the hopes that it would cause this chain reaction. Discover went to individual merchants and was trying to negotiate agreements where Discover would tell the particular merchant, we will give you the following discount on your merchant fee in return for your commitment to engage in the following steering practices. And that is a form of competition on the cardholder side in which the networks could otherwise have engaged. And at least so long as the large merchants feel that dropping Amex entirely isn't an economically feasible alternative, that form of competition is entirely foreclosed. Yes, Visa and MasterCard can cut their own merchant rates unilaterally, but if the merchants can't give their own customers any advantage for using a card that has that effect, then it's a shot in the dark. It's unlikely to be a competitive – a successful competitive strategy. And so I guess the – Sotomayor, I'm sorry, what was the second general principle? That is the second general principle, that not only should the court of appeals not have collapsed the two sides of the markets, but that in asking whether the non-discrimination provisions, the anti-steering rules, were beneficial or harmful to consumers, it should have focused specifically on the effects on competition. It shouldn't have – The court below didn't do step two here. That's correct. You're saying, do we have to accept that it's always – looking at both sides of the market is always appropriate, or is it only in this case that it might be appropriate, and how would it be appropriate if we looked at it under step two? I guess I would – with respect to two-sided platforms generally, I would simply – I guess the only rule we would urge the court to adopt is the fact that two interrelated markets are distinct for purposes of the first side of the analysis. The market power inquiry should not preclude the court from considering benefits on the other interrelated market at the second stage of the analysis. Thank you, counsel. Mr. Chesler.  The district court described competition for credit card transactions as fierce. There is no transaction without a cardholder and a merchant simultaneously executing one. To compete for that business against ubiquitous and, frankly, larger rivals, Amex offers consumers what they want, and transaction volume has, in fact, increased dramatically and accordingly. Amex requires merchants not to undermine its cardholder relationship and its investment, not to work against Amex if it's going to be Amex's representative to consumers.  Sotomayor, isn't that the essence of competition, to have somebody working against you? I mean, I always thought that that was the essence of competition, that someone will come in and offer the people involved in the transaction something better. Your Honor, that is the essence. Better or that they may not know they want, but that they may want. I have to say, if I go to a cash register and the merchant says to me, I'll give you a 1 percent discount today if you don't use Amex, I sit there and think to myself, do I need the airplane rewards or the train rewards, or do I want the 1 percent? And I do it and I choose differently each time depending on the nature of the transaction. But you've – this anti-steering removes that competition. Your Honor, the product here, we need to start the analysis with the question of what is the product. You haven't told me why it doesn't remove competition. Because, in fact, it enhances competition between the brands, and that's what happened here. The competition between the brands – But I don't care about the brands. I care about my price. That's what price competition is about. Exactly, Your Honor. I care about whether today I want to pay the 1 percent more or not. And, Your Honor – And this vertical restraint is stopping horizontal competition. Your Honor, I disagree with that. In fact, the district court here said no one had proved what the price of the product is. So we can't, in fact, conclude – I don't really care. All I know is that the merchant is offering me this at $90 or $100, and I have a choice between paying $100 or $99. At this moment, I'm paying a higher price to use American Express than I want to pay. But what you don't know, Your Honor, in that hypothetical and what the district court found was never proven, is what the effect on the other side of the same price is. Every time your rewards are reduced, that's a price increase to you. And the district court explicitly found – No, only if I'm going to use the rewards. Whether you – No, because if I'm not going to use the rewards, the $99 is still more valuable to me. But, Your Honor, you may want to use the rewards on the next transaction, and when you aggregate those rewards, if you've collected fewer rewards, you've paid a price increase. And the district court found – You're making my choice for me. You're not giving me the choice. And that's what price competition is about, my choice, not your choice about what's more valuable to me. Your Honor, I think one of the – Some people – it's hard to believe, but there are credit card users who will never use their reward points. Your system depends on that. And there are – Your Honor, I agree with you. They may not choose to use the rewards. But when you look at the market aggregated here, the fact is, there was no proof at the end of the day of what the price for the product at issue is. The product at issue here are credit card transactions. You cannot have a credit card transaction unless a consumer and a merchant come together. And the question is, what's happened to the output of those transactions? What's happened to the quality of those transactions? And what's happened to the price of those transactions? That's one question. Now I'm beginning to understand this. I do sometimes learn something, as I just did for Mr. Stewart and the others, in this oral argument. And my problem is that I grew up in antitrust at a time when people didn't use phrases like platforms and two-sided markets. So I have to translate things into a language that I've been using for 40 years. But okay. So now as I see your argument, I started out not seeing what it was. Tell me if I'm right and don't just agree if I'm not. I really analogize this to a firm that makes things and sells through dealers. Now, it used to be correct that you couldn't tell the dealer he had to fix his prices because that stopped intra-brand competition. And you couldn't tell the dealer he had to divide markets. You couldn't divide them. And that's changed because sometimes those are justified. And usually the argument they are justified is that by fixing the dealer's prices among themselves or giving him exclusive territories, we will encourage him to work harder to sell our brand. And that sometimes is a justification. And it seems to me you are simply making a variation on that theme. You are saying by engaging in this agreement among dealers, which is, after all, an agreement that does not directly, but indirectly has a tendency to fix, to raise prices. Therefore, in a sense, there's an anti-competitive aspect. But by doing that, by doing that, we are better able to get a product through to the consumer that, in fact, they will prefer more. Now, have I correctly stated, at least in general terms, the form of your argument? In general terms, you have, Your Honor, and may I add, and by our providing those rewards to consumers, Visa and MasterCard, who control 70-odd percent of the market, were required to respond in kind, and the result is that output has increased. Output has increased. A person says, let me tell the dealer of the car that he has to fix prices with the others, resale, price, maintenance, because I'll get my new gizmo car through, and that will improve everybody's life. Okay? Now, if that's the form of the argument, then isn't the way I can be a little traditional, say, step one, is there an anti-competitive aspect? Then we go to step two, what is the justification and does it outbalance, et cetera. Okay. So far, we're at step one. Is there an anti-competitive aspect? Well, of course, it seems to me obvious, of course there is. When you tell the dealer that he can't tell the customer that he's charging a lower price, that's anti-competitive. Right then and there, and I don't see any other argument. I mean, how could that be pro-competitive? I mean, maybe there's a justification for it in terms of what you're going to do eventually, but how can that not be anti-competitive? Because, Your Honor, you must ask that question with respect to the product at issue, and with respect, your hypothetical only related to part of the product. The product is the transaction. Indeed, the government contended at trial that American Express had 26% of the market. That's 26% of the dollar volume of transactions. And if I change Your Honor's hypothetical to ask, is there an anti-competitive prima facie case with respect to the product, the transaction, the answer is absolutely not. Output of the product has soared. Quality, which the government admitted in front of the Second Circuit at their argument, has improved dramatically. And as the district court found, the price of that product was never proved. So no one can say it was super-competitive. Output of the product has increased. That has so many factors that go into that besides the nature of the particular product, right? I mean, if the economy grows, then the output of your product, credit card transactions, grows, right? It could, Your Honor, but the evidence here was that what was driving it was the fierce competition that the district court found between the card providers, which was driven by the rewards that Visa and MasterCard were forced to match because of American Express's rewards. There could be exogenous reasons why output increases, but the government's speculation that it had to do with other factors is just that. It's speculation. When you say the product, what are you talking about? The number of credit card transactions or the dollar volume? Dollar volume, and that's what the government and the district court both said was the best metric. Then what worries me about that, I have just the same. Look, you both have put your finger, it seems to me, on one of the most, as you know, I think, unless it's changed, one of the most difficult problems in antitrust law, how to define a market. And by and large, the answer to that differs in depending on a lot of different circumstances and what you're up to. And so with an agreement that has an anticompetitive impact of some kind, it's easier, and you know, get away from this. If you can identify an anticompetitive impact, think of the new Gizmo car, which has 18 dealers. We give each an exclusive area. And for analysis purposes, I don't think you have to worry about a market. You say, look, that fact of exclusive areas stops these dealers from competing with each other. End of the matter. Right then and there, you have an anticompetitive impact. And then we go on to question two. Is it nonetheless worthwhile? Now, maybe you, I've read the Second Circuit. I know some of those judges know antitrust law pretty well and so forth. But I just don't see something that improves on that basic thing, unless you want to come in and say, oh, this had no impact, you know, because he only had 2 percent of the relevant market, in which case, why did he enter into it? You know, I can imagine variations. But you see how I'm thinking. I do, Your Honor. And if I may, the point in your hypothetical, which I want to embrace, because it really does make the point I'm trying to make, is the product was the new car with these Gizmos on it. And you found in your hypothetical, I believe, that there was an anticompetitive effect at the first stage with respect to that product. And what I'm here to tell you is, with respect to the product at issue here, which is credit card transactions, the government did not prove that there was an anticompetitive effect, because output was up, quality was up, and they didn't prove what the price of that product was. So you couldn't possibly conclude that the price was supercompetitive. It's anticompetitive in one way. In one way. You cannot get through to the dealer, to the customer, the fact that these different companies, some charge lower, some charge higher prices. The product you're buying, some will be lower, some will be higher. That is a fairly key element, which this prevents you from getting through in terms of information to the person who's going to be buying. Respectfully, Your Honor, it does not. The credit card companies are perfectly free, as Justice Gorsuch's questions asked before, to tell the consumers what they're charged with. But the merchant is not. And indeed, were we to start down that road and say, don't worry when you get a promise among merchants not to tell people what prices are? Because, after all, the person who sells through you could always advertise. That, I think, would have a pretty strong anticompetitive impact across the country. If there weren't. Sotomayor, I'm sorry. The advertising mechanism failed completely. Discover tried it and said, I'm just leaving money on the table. And the reason why they said that is because the restrictions are not just don't tell them the price difference, but don't steer them away from American Express by giving them a better deal in some other way. So you're not talking about a restriction just on what you tell them, but it's a restriction on what you do. And so that anticompetitive effect is broader than just don't talk. No, Your Honor. In fact, Discover couldn't tell them to, or as they tried very hard, to have the merchant agree to try to pass off the price saving to the customer. They couldn't do it under American Express's conditions. Your Honor, Discover had 5 percent, give or take, of the market before these provisions were enforced. They had 5 percent after these provisions were enforced. And when I asked the president of Discover, what about the millions and millions of merchants in America which do not accept American Express cards and therefore have none of these provisions? Have you, in fact, adopted that strategy at those merchants? He said no. So what we're talking about with respect to Discover is the issue of protecting a particular competitor, not protecting competition. I don't think that that's right, Mr. Chesler. I mean, I think that the Discover issue is about protecting low-cost products. Because the reason that we've said vertical restraints are often perfectly fine, indeed better for competition, is because it allows us to have some high-cost products and some low-cost products. High-cost, high-service, low-cost, low-service. The problem here is that the effect of these anti-steering provisions means a market where we will only have high-cost, high-service products. And any competitor that wants to come in and says, you know what? We want to compete in a different way. We want to compete in terms of cost, is going to find itself unable to do so. And that's the thing that makes this vertical restraint, it seems to me, different. Different from others. Your Honor, in fact, there are many low-cost, low-reward options on the market today. They're advertised all the time. I saw an ad for one on TV this morning as I was putting my tie on. There is no inability to offer a wide range of low-cost. Mr. Chesler, if I'm a consumer, I mean, it might be that I'm very altruistic and I just care about my local coffee shop and the kind of deal that the proprietors are getting. But more to the point, what I really care about is if that local coffee shop can pass on its decrease in price to me. And that's exactly what the anti-steering provisions prevent. It prevents the vendor from passing on the lower merchant fees to the consumer. And as long as that's the case, you're just not going to be able to construct a business strategy based on a low-cost card. Your Honor, again. And this is exactly, I mean, it's not me making this up. There was a seven-week trial. And that's exactly what the district court found. And these are findings of fact about Discover, about the effect of this anti-steering provision on the actual state of competition in the market, meaning on the ability of low-cost cards to compete. If I may respond, Your Honor. The district court also found that this two-sided market was, as he said, different from virtually all others because here the two sides were inextricably linked and intertwined. And here, Your Honor, I would submit the product, which is the transaction, is a product that has a cost and a price associated with both of the parties to it, the consumer and the merchant. And under Your Honor's hypothetical, if in fact that price is lowered, the merchant cost is lowered, the rewards are lowered, and that's a price increase to the consumer which was never proved on this record. But we don't know that because we don't know, and American Express is the only one who does know, we do know that the entire price increase is not passed on to consumers. So there is a profit margin in there that can be distributed or one profit margin lowered to the benefit of the customers or not. But that's what competition is about. Every competitor will decide what mix of profit, what mix will go to the consumer, won't go to the consumer, and the consumer, finding a fact by the 7-week trial judge, will benefit with lower prices. Your Honor, in fact, as the Court of Appeals pointed out, the fact that not every penny of the merchant fee is passed on in rewards to the consumer tells you nothing about the other costs that the card company is incurring. And the government did not prove what those costs are. It could well be that in fact the— But isn't that what the rule of reason does by putting this at step two? Government's never going to know that. It doesn't know your business model. If you want to argue pro-competitive effects, you show it. It's not up to the government to show in a different market that there's a benefit that outweighs the price stifling in the main market. I mean, I've never heard of such a thing. If you think there's pro-competitive effects, you prove it. Your Honor, it is the defendant's obligation or burden to prove pro-competitive effects when the plaintiff proves a prima facie case of anti-competitive effect with respect to a product at issue. Mr. Chesler, on that, with respect to that, and in response to Justice Breyer, we talked about the fact that the agreement does limit the merchant's ability to do certain things and whether that might meet step one. But I would have thought under Section 1 you might have responded, yes, if there's market power. But market power, absent market power, an agreement with a merchant to do anything that restricts anything is not in the cognizance of the antitrust laws. And a 26 percent player, absent some proof, other proof, is not, does not have market power. Your Honor, I could and should have added that to my answer, and it's more than that here. It is... I thought we had two ways of proving market power, direct and indirect. You need to show a certain control of the market in indirect, but I think case after case have said if you can control prices, you have market power. If I may respond. Let me talk about the indirect first. Twenty-six percent of the market, never been a decision in this Court that I'm aware of that's found market power in that case. One out of every ten cards in America, only one out of ten is an American Express card. Three million merchants do not accept American Express cards. They chose not to do business with us. They all do business with Visa and MasterCard. This company has no power, and the District, the Court of Appeals found it had no power, and the States did not raise those issues here. But every competitor raised their price to match American Express's merchant price. To fuel... So this vertical restraint had a complete horizontal effect. So it has market power to control the merchant market. Respectfully, Your Honor, I don't think that's what happened here. The increases by the card companies were, as the District Court found, to fuel the intense competition for cardholders without whom there will be no transactions. That's what the findings are. And if prices go up because the costs of providing a competitive option to consumers go up, that's not anti-competitive. That's pro-competitive. On that point, you know, it looks to me like market power is a gremlin that you are going to throw, if we accept that, throw into the gears of antitrust law as it has been under Section 1 across the country, everywhere. I mean, I thought, and perhaps there have been changes, but I haven't seen them in this Court. I thought that if, in fact, three people agree upon their prices, or forget price convention, where they will hire Mr. Smith, who will lecture to them about the benefits of all charging the same price, I would have thought you just said that's anti-competitive. That's anti-competitive. There's no need to look at this gizmo called market power, which is a nightmare. Now, if the defendant wants to come along and says, I'll tell you something, judge, because nobody had any market power, this couldn't do anything, then you would wonder why they did it. But I would leave you that option, you know, if you're the defendant. So where is this thing you have to prove in every Section 1 case, market power? I've not seen it. Is it in a case I haven't read, which is quite possible? Your Honor, if we were talking about a horizontal restraint, which was what your comment was directed at, I would be in complete agreement with you, because the error costs of a horizontal restraint are very low. It's almost always to get people to charge more for less. What's the vertical case? Even Ligon didn't say that. I mean, you know, I say even because I dissented. But nonetheless. I recall that, Your Honor. Nonetheless. I recall that. Nonetheless, I've not seen a Section 1 case. Now, I'm not saying there couldn't be one. But I am saying I don't think it's a universal requirement. And I think if you have an anti-competitive agreement, which looks anti-competitive, seems anti-competitive, et cetera, why go into market power? Because, Your Honor, in a vertical restraint, as this Court has said repeatedly over the last 40 years, the error costs are very low. Because when a company, particularly a company without power, imposes a vertical restraint, it is to enhance its ability to compete against other brands. And as Justice Kennedy said in the Brooke case, a price increase in the face of increasing demand tells the trier of fact nothing about whether it's anti-competitive. One needs to determine if excess profits are being extracted, monopoly rents are being extracted. And the plaintiff here didn't even prove what our costs were, let alone our margins. If the standard that this Court articulates, Your Honor, is a standard in which a price increase without proof of a restriction of output, without proof of a harmed quality, without proof that excess profits have been extracted, if that's enough to satisfy a prima facie case, then what will happen in the lower courts, and I speak from 42 years of experience of trying antitrust cases, there will be a wave, a tsunami of false positives in the lower courts. I only have 42 years of teaching antitrust, and I would say in that, in that experience, which is not as good as yours actually, because you actually have practical experience, but it seems to me there have been a lot of cases where you would not see price increases, the main one being Alcoa. I mean, Alcoa, which used to be thought to be the best case ever written in antitrust, learned at hand. It has no price increase. There it was only market power. I know you're going to say that, but that's a different point. I was about to say that's a different point. I think I heard that from someplace at the back. But, Your Honor, in a vertical restraint case, if output is going up, if costs are going up because they're investing in rewards that are benefiting the consumer, that's the way a competitive market is supposed to act. And all I'm saying to Your Honor is if the test that this Court articulates is the test that's suggested by the folks to my right, then we are going to have a wave of positives that are false where real competition is taking place because price increases occur for all sorts of reasons, many of which are perfectly benign, which is exactly what happened here with respect to the merchant fees, because they were fueling price decreases to the consumers. Every reward, every seat on a plane to Aruba, every ticket to a Billy Joel concert, every cash back reward that's given is a price discount to the consumer. And what the District Court found here is nobody proved to me what that price is for the product at issue. So the result that we're trying to avoid here is a situation in which a plaintiff can fail to prove what the price of the product is, merely that there's been an increase to part of that price, and that that's enough to satisfy the first leg of the rule of reason, and the burden then falls to the defendant to disprove what the plaintiff has failed to prove. That will create mischief. Professor Katz, the government's only expert here from Berkeley, testified that in a two-sided platform, if you don't completely and accurately assess the impact on both sides of the platform, you will get misleading conclusions. And with respect, Your Honor, that's what will happen if this Court only looks at the activity vis-a-vis the merchant, when there is a consumer standing opposite her without whom the product doesn't exist. And that's what — Counsel, that's Step 2. No, Your Honor, that's Step 1. There is no case that I'm aware of in which a plaintiff has satisfied its burden on Step 1 by proving an impact on competition on something other than the product that is at issue here. And they didn't prove Step 1. Sotomayor, we've had two-sided markets that we've looked at in antitrust law. Justice Breyer just mentioned one. How about the newspaper advertisers and the newspaper readers? Can we take that one? I'd like to take that one. That's the Picayune case? Picayune. The transaction in that case. Again, my request to this Court is always start with the same question. What's the product at issue? The product at issue in Times Picayune was advertising sales between the advertisers and the newspapers. While there were subscribers to those newspapers, they had nothing to do with that transaction. Oh, yes, they did, because the number of subscribers affected the price that the advertisers were going to use and their inducement to use the — to subsidize both morning and afternoon advertisements. And that distinction is exactly why this Court need not decide in this case a rule for all time for every two-sided platform. This case is a situation in which there is no transaction unless those two parties, the consumer and the merchant, come together at the same moment in time and complete the transaction. That was not true in Times Picayune. Ultimately, over the course of time, if the advertisers didn't put their ads in the But you could have a completed transaction in Times Picayune without the consumer, the subscriber, being involved in that transaction. Mr. Chesler, I don't have 42 years of antitrust experience teaching or practicing. It just requires a little time. So I just think of this in sort of simple-minded ways. Here's what the district court found. The district court found that merchants cannot steer customers to cheaper forms of payment. The district court found that all of the credit card firms have consistently raised their prices. Even when you look at these two-sided prices, the district court found that these price increases were not being passed on to consumers. And the district court found that it was impossible for a credit card company that wanted to offer a low-cost, low-price product to enter the market. So you put all of those things together. That sounds like a market that is not working in the way it's supposed to, at least sufficiently, to get on to the second step where you can make all your arguments about why it is that a market where the prices only go up and where no low-price competition can emerge is nonetheless a good market. Your Honor, my answer to that is that every one of those findings dealt only with the merchant relationship. They had nothing to do with the consumers. And again, here, without that consumer presenting her card to the merchant, the transactions that were being debated in this case wouldn't even exist. The district court itself found that there was no proof of the actual price to the two sides of that transaction. The government had failed to prove that. The government had failed to prove what the costs were for the services provided to the merchant, and it failed to prove what the consumer side of the price was. So we didn't challenge any of those findings in the Court of Appeals, nor do we challenge them here, because they are all clapping with one hand. They're only talking about what happens on one side of the counter when you present your card to buy that sweater. Well, it's the one hand where the government has the burden. And now if you want to come in and you can say, look, there are all these great benefits that go beyond. I mean, some of your benefits sort of seem to me to be benefits for American Express only. But if you want to say, no, there are great benefits for the market generally, that's what Step 2 is about. You only get to Step 2, respectfully, Your Honor, if the government proves that competition for the product has been impaired at Step 1. And what I've said over and over again here is the product is the transaction, and none of those findings related to the transaction. Thank you, counsel. Mr. Murphy, you have three minutes remaining. Mr. Chief Justice, just a few points in rebuttal. The first of those is I think the most important point for this Court to take from this case is that certainly the Court has lessened the scrutiny with respect to vertical restraints in recent years. But this particular vertical restraint, the one at issue here, has the same effects that we would anticipate happening with a horizontal cartel. If all of the credit card companies got together and said, we're going to not allow steering, that would cut off price competition on the merchant side. It would still allow for quality reward competition on the other side. But that rule would be per se illegal. That rule would be per se illegal despite the alleged benefits on the cardholder side. Just as this Court said in the engineer's case, the engineers can't get together, fix prices, and then justify that on the basis of the allegedly improved quality. It's per se illegal. We're not in the per se illegal rule here because this is a rule of reason case. But what the evidence shows under the rule of reason, the full market analysis, is that it has the same exact effects that one would anticipate with a horizontal cartel. And that's why the government has to do it. Ginsburg, what is the relief that you're seeking? Are you seeking to say the Second Circuit was wrong in saying you didn't, the government didn't prove step one, and now we've got to close back for a step two examination? Is that what you're saying? Absolutely. Just to answer the question presented, which was whether the government met its prima fossa case based on the effects that we showed at the trial. And then on remand, they can preserve any arguments that they have preserved, they can present to the Second Circuit. And then with respect to price, we would readily agree that higher price can oftentimes arise from different reasons. That's why the Court in Brooke Group said that the government should prove that the higher prices arise from non-market forces. Here, the district court found as a fact that higher prices weren't arising because of the cardholder rewards. They were arising because of these restraints. And the Discover example of that phenomenon is quite powerful. Discover saw the higher prices, saw the discontent in the merchants, and responded with its low-cutting option, price-cutting option. And all the merchants came to Discover and said, sorry, we'd love to shift share to you, but there's nothing we can do about it because of these restraints. That quite powerfully shows the horizontal effects. With respect to market power, I think that we would be fine with a rule that market power needed to be shown. We just think that the evidence overwhelmingly shows. Roberts. I just want to pause right there. You accept that to show on any competitive effect, you have to show not just an agreement, but also that market power in some way, shape, or form. So we would readily we just disagree on the manner in which it need be shown. Right. But you agree it need be shown. Yes. So we showed market power, but we showed it quite powerfully in this case with this restraint affecting merchants making up some 90 percent of the market. And nobody without market power could actually affect industry-wide prices. And that's what we have going on here. If there were no market power, an agreement would have no, any competitive effect. Absolutely. As Judge Bork said in the D.C. Circuit case, it would be suicidal for a producer to adopt a restraint without market power. But here, obviously, it wouldn't be suicidal. This is the legged situation. This is a vertical restraint that control, that has a horizontal effect. It's not like Legion. Legion was only a restriction on. No, I'm not like it, but it was the exception Legion talked about.  Legion allowed for room for this analysis. Thank you, Your Honor. Thank you, counsel. The case is submitted.